UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

RALPH DAVID SMITH                                            CIVIL ACTION

VERSUS                                                       NUMBER: 13-4800

CAROLYN W. COLVIN, ACTING                                    SECTION: "N"(5)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for Disability Insurance Benefits ("DIB"). (Rec. docs. 10, 15).

Ralph David Smith, Plaintiff herein, filed the subject application for DIB on July 8, 2011 alleging disability as of June 17, 2011. (Tr. pp. 109-115). In a Disability Report that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as ventricular tachycardia and coronary artery disease. (Tr. pp. 133-139). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on August 10, 2011. (Tr. pp. 48-51). Pursuant to Plaintiff's request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on March 28, 2012 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 54-55, 22-37). On April 5, 2012, the ALJ issued a written decision in which she concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 8-21). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on April 17, 2013, thus making the

ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-6). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to the 42 U.S.C. §405(g).

In his cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

> I. THE ALJ FAILED TO APPLY THE PROPER LEGAL STANDARD TO DETERMINE THE CREDIBILITY OF THE PLAINTIFF.
>
> II. THE ALJ DID NOT APPLY THE CORRECT LEGAL STANDARD IN ASSESSING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY.

(Rec. doc. 10-1, p. 4).

Relevant to the resolution of those issues are the following findings that were made by the ALJ:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since June 17, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: status-post single automatic implantable cardioverter defibrillator (AICD) implantation, and basal cell carcinoma of the skin (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he cannot climb ladders, ropes, and scaffolds, cannot work at heights or around dangerous machinery, and has to avoid working in the sun.

6. The claimant is capable of performing past relevant work as a customer service representative. This work does not require the performance of

>    work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from June 17, 2011, through the date of this decision (20 CFR 404.1520(f)).

(Tr. pp. 13, 14, 16).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not re-weigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1983). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §404.1520 as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2. an individual who does not have a "severe impairment" will not be found to be disabled;

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made;

5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). In determining whether a claimant is capable of performing the work that he has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. *Villa*, 895 F.2d at 1022; *Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988); *Epps v. Harris*, 624 F.2d 1267,

1274 (5th Cir. 1980).  The assessment of the demands of a claimant's prior work ". . .  may rest on descriptions of past work as actually performed or as generally performed in the national economy."  *Villa*, 895 F.2d at 1022 (citing *Jones v. Bowen*, 829 F.2d 524, 527 n.2 (5th Cir. 1987)).  A finding that the claimant is disabled or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

    The documentary evidence that was generated during the relevant time period[1] begins with treatment records from the East Jefferson General Hospital ("EJGH") commencing on June 17, 2011, the alleged disability onset date, which described the following occurrence:  Plaintiff was at that time a FedEx deliveryperson who, after working all day in the heat, got home and proceeded to cut his neighbor's lawn.  There was intense sweating during the course of the evening and at the completion of the yardwork, Plaintiff noticed intense weakness with diaphoresis but no particular palpitations, chest pain, or shortness of breath.  Emergency medical technicians were ultimately summoned and, during transport, noted a rapid heartbeat with no objective confirmation for which Plaintiff was defibrillated with successful resumption of sinus rhythm.  Upon admission, Plaintiff's cardiac history was noted to be positive for acute inferolateral myocardial infarction in 2008 that was successfully treated with stenting of a total circumflex occlusion. Subsequently, Plaintiff presented in September of 2010 with chest discomfort and

---

[1] Under 20 C.F.R. §404.1512(d), the Commissioner is charged with developing the medical history of a DIB claimant "...<u>for at least the 12 months preceding the month in which you file your application</u> unless there is reason to believe that development of an earlier period is necessary or <u>unless you say that your disability began less than 12 months before you filed your application</u>." (Emphasis added).  As Plaintiff filed his application for DIB on July 8, 2011 and alleged disability as of June 17, 2011, which is less than twelve months earlier, the relevant time period begins with the latter date.

underwent cardiac catheterization that revealed wide patency of the previously stented site and a moderate lesion within the midportion of the left anterior descending artery. That was evaluated via a flow wire technique and was found to be hemodynamically insignificant and Plaintiff had been doing well since that time. The initial assessment on June 17, 2011 was:  1) non-ST elevation myocardial infarction possibly secondary to volume depletion, dehydration, and possible ventricular arrhythmia with successful defibrillation in the field without objective documentation; and 2) dyslipidemia with recommended conservative strategy versus coronary angiography.

Although Plaintiff's heart rhythm remained stable in the EJGH Emergency Room ("ER"), he opted to proceed with left heart catheterization and left ventricular angiography on June 18, 2011.  That study revealed the presence of global hypokinesis with an LVEF of 40%; the previously stented segments of the circumflex coronary artery were widely patent and there were no other flow restrictive lesions of significance.  Based on the results of that study, it was recommended that Plaintiff receive a single lead implantable cardioverter defibrillator ("AICD" or "ICD") "for secondary prevention" and implement intense risk-factor modification.  Like the angiography, the implantation was performed by Dr. William Rolston on June 21, 2011 without complications.  Plaintiff was discharged the following day with a final diagnosis of:  1) sudden cardiac death with successful cardioversion of ventricular tachycardia to sinus rhythm; 2) coronary artery disease, prior inferior lateral myocardial infarction in 2008 with successful stenting of the total circumflex occlusion; and, 3) dyslipidemia.  Plaintiff was to monitor his activity for a week and was to be reevaluated at that time.  (Tr. pp. 211-231).  Other discharge instructions included no driving pending doctor approval, no heavy lifting of greater than ten pounds

for a few weeks, avoidance of overhead raising of the left arm, and a gradual return to full activity.  (Tr. pp. 261-262).

Plaintiff returned to EJGH on June 22, 2011 for a chest x-ray which revealed interval placement of the pacemaker with no pneumothorax and no acute cardiopulmonary disease seen.  (Tr. p. 339).  An ECG that was done on that date revealed sinus bradycardia and a first degree A-V block but was otherwise normal.  (Tr. p. 343).   On June 29, 2011, Dr. Rolston executed a "To Whom It May Concern" letter in which he first recalled Plaintiff's stenting in 2008 and AICD placement on June 21, 2011.  The doctor then opined that at point in time, Plaintiff was ". . . severely limited in terms of physical activity, with severe shortness of breath with minimal exertion.  He continues to be at high risk for subsequent heart attack and complications there from sudden cardiac death."  Dr. Rolston further opined that Plaintiff was ". . . unable to participate in any sort of mental or physical work and I have suggested that he retire from his current position as a Fed-Ex delivery person."  (Tr. p. 487).  However, a contemporaneous treatment note from that date contains no clear indication of any complained-of symptoms or doctor-imposed limitations.   (Tr. p. 335). While the record does contain the results of an ECG from that same date that was characterized as abnormal, the report also bears a notation of "[u]nconfirmed [a]nalysis." (Tr. p. 342).

On July 12, 2011, Plaintiff completed the SSA's "Function Report-Adult" form that is designed to elicit information about how his conditions limited his activities.  There, Plaintiff indicated that he was severely limited in terms of physical activities, with shortness of breath occurring on minimal activity, leading him to conclude that he was ". . . unable to participate in any physical work at all."  A typical day for Plaintiff involved rising,

7

watching TV, and reading around taking in his three daily meals. His physical energy was diminished due to shortness of breath brought on with small amounts of exertion. Plaintiff's physical conditions did not affect his sleep or his ability to tend to his personal needs. Cooking was primarily done by Plaintiff's wife but he could cook meals if necessary as well as do laundry. Plaintiff got outside of his house as the heat permitted and he could both drive and ride in a car. He could tend to financial matters as needed, spent time visiting family members, and went to church once per week. However, he did not feel strong enough to stay away from home for any length of time. As a result of shortness of breath with minimal exertion, Plaintiff's ability to lift, stand, reach, walk, kneel, stair climb, and complete tasks were all limited to some degree. He estimated that he could walk for only one city block before needing to rest for varied periods of time. Plaintiff had no deficits with attention or following written or spoken instruction. However, he was having difficulty adjusting to his new lifestyle and experienced fears of being unable to support and take care of his family. (Tr. pp. 141-148).

Plaintiff was seen again by Dr. Rolston on July 21, 2011 and complaints at the time were documented as fatigue, shortness of breath, and low exercise capability. (Tr. p. 334). At a further follow-up visit on August 11, 2011, it was reported that Plaintiff was feeling better but was still suffering from low capacity or endurance with activity. He was still not allowed to cut the grass. (Tr. p. 333).

On March 27, 2012, Dr. Rolston corresponded with Plaintiff's attorney and recalled Plaintiff's presentation to the EJGH ER on June 17, 2011 and his resulting need for a cardiac defibrillator. The doctor reported that Plaintiff was having a difficult time adjusting to his medical condition and that he had been placed on Zoloft on February 23, 2012 which had

proven to be effective. Dr. Rolston was to continue to follow Plaintiff's condition. (Tr, p. 485). Two days later, the doctor executed a second "To Whom It May Concern" letter which referenced his initial, similar missive of June 29, 2011 and related that Plaintiff ". . . continues to be at an extraordinarily high risk for sudden cardiac death. Because of this he is unable to participate in the duties of his present job, as well as the duties of any other type of employment." The doctor further opined that Plaintiff was ". . . totally disabled at the current time and unfit for any type of employment because of [the] continued high risk cardiac conditions as outlined above." (Tr. p. 486).

During the relevant time period, Plaintiff was also treated for basal cell carcinoma. On July 15, 2011, a biopsy that was done by Dr. Richard Marshall revealed basal cell carcinoma of the right cheek. (Tr. pp. 391, 393). The sutures from that procedure were removed on July 22, 2011 and the wound site was described as good with no signs of infection. (Tr. p. 390). On August 31, 2011, the tumor was removed by Dr. Eric Finley via the "Mohs" technique. (Tr. pp. 385-386). Plaintiff returned to Dr. Marshall on September 14, 2011 and although he complained of no specific spots of concern, biopsies demonstrated basal cell carcinoma at two additional sites, the left shoulder and the left nasal side wall. (Tr. pp. 384, 392). On November 28, 2011, Dr. Finley removed another tumor at the eyelid and nasal root on the left, again using the "Mohs" technique. (Tr. p. 468). The wound was well-healed by December 5, 2011. (Tr. p. 477). Excision of the tumor on Plaintiff's left shoulder was performed by Dr. Finley on December 6, 2011. (Tr. pp. 466-467, 474). Plaintiff was seen again by Dr. Marshall on December 14, 2011 for a full body examination and no positive spots were revealed. (Tr. p. 465). On December 20,

9

2011, sutures were removed from Plaintiff's left shoulder and the wound was described as well-healed. (Tr. p. 473).

As noted earlier, a hearing *de novo* before an ALJ went forward on March 28, 2012. After the documentary exhibits were admitted into evidence Plaintiff was sworn and was questioned by the ALJ. He was fifty-four years of age at the time, had a high school diploma, and had last worked as a deliveryman for FedEx until his cardiac event on June 17, 2011. Prior to that, Plaintiff had worked as a debris monitor for the Corps of Engineers following Hurricane Katrina, preceded by work as a customer service representative for BellSouth and that as a limousine driver for author Anne Rice. After receiving his defibrillator in June of 2011, Plaintiff had not done much of anything on the advice of his doctor. Since then, Plaintiff had the device tested every three months which had functioned without incident. When asked if he had any other limiting conditions, Plaintiff answered in the negative except for the skin cancers that had recently been removed. (Tr. pp. 24-28).

Continuing, Plaintiff testified that an average day consisted of rising early, reading the newspaper, and ". . . do[ing] a little bit of exercise here and there because the doctor wants me to walk. I walk maybe a little bit in the morning, a little bit in the afternoon, but pretty much I do nothing during the day because I can't. I get short of breath and, you know, if I do any physical activity." Cooking, cleaning, laundry, and shopping were all performed by Plaintiff's wife and daughter although he could unload the dishwasher. Family and friends were visited occasionally and Plaintiff attended church weekly. Yardwork was done by Plaintiff's wife or his daughter's boyfriend. In terms of recreational activities, Plaintiff read a book from time to time, did ". . . a little bit of walking," took his dog for a walk, and sometimes just sat outside and enjoyed the weather. He used to bike

ride but couldn't ". . . do that much anymore because it's a little bit too strenuous." Plaintiff also enjoyed doing crossword puzzles and Sudoku. He could drive again after being given approval by his physician. Plaintiff experienced no side effects from his medications except for Zoloft which seemed to be resolving as time went on. (Tr. pp. 28-30).

When asked how far he could walk Plaintiff answered that he could ". . . walk a couple of blocks, and I do it a couple of times a day because I need to increase my heart rate according to the doctor." Standing could be accomplished for an hour at a time before his legs started to give him a little trouble. Plaintiff estimated that he could lift 25-30 pounds and he had no problems with sitting except when done for lengthy periods of time which caused slight numbness to his lower extremities. (Tr. p. 30).

Upon being tendered to his attorney for further questioning, Plaintiff testified that he became tired and short of breath after climbing a flight of stairs. A couple of times during the day Plaintiff would lie down to relax because he needed to rest. He further explained that his doctor had instructed him ". . . to stay active like doing the walking and just taking it easy, overall taking it easy." If cumulated, Plaintiff estimated that he spent a total of two hours lying down during the course of a day. When asked if he could return to his past work as a customer service representative, Plaintiff answered in the negative, citing an inability to sit for long periods of time, the stress occasioned by the job, and an overall inability to perform the job from a physical standpoint. (Tr. pp. 30-32).

Karen Harrison, a VE, was the next witness to take the stand. She began by classifying the exertional and skill demands of Plaintiff's past work, as follows: FedEx delivery driver – medium, semi-skilled; debris monitor – light, skilled; customer service representative – sedentary, skilled; and, driver/chauffeur – light, semi-skilled. The ALJ

11

then posed a hypothetical question to the VE which assumed a person of Plaintiff's age, education, and work experience who could perform light-level work with no ladders, ropes, scaffolds, or at heights and that was done away from the sun. With that profile in mind, the VE testified that the described individual would be able to perform Plaintiff's past work as a customer service representative or chauffeur. If the exertion level of the hypothetical question was reduced to sedentary, the VE further testified that the described individual could still function as a customer service representative. After being tendered to Plaintiff's counsel for further questioning, counsel added to the second hypothetical that had been posed by the ALJ a need to lie down for two hours per day. With that added limitation in mind, the VE testified that the described individual would be unable to work. To the second hypo that had been propounded by the ALJ counsel then added the ability to sit for only two or three hours in an eight-hour workday. Faced with that hypothetical question, the VE testified that the described individual would be able to perform other sedentary-level jobs that allowed for alternating sitting and standing such as receptionist, information clerk, interviewer, and customer service representative, significant numbers of which existed in the local and national economies. A final hypo was posed to the VE which assumed an ability to sit for only two to three hours and an ability to stand for only one to two hours per eight-hour workday. In answer thereto, the VE testified that full-time employment could not be performed as the total of sitting and standing time did not add up to eight hours. (Tr. pp. 32-37).

Plaintiff's first challenge to the Commissioner's decision is that the ALJ failed to apply the proper legal standard in determining his credibility in that she failed to follow the two-step analysis set forth in Social Security Ruling ("SSR") 96-7p. Plaintiff argues that the

12

limitations that he testified to at the administrative hearing are supported by the objective evidence of record and that the ALJ erred in relying on the absence of cardiac treatment in discrediting Dr. Rolston's opinion that he was at high risk for a further cardiac event and that he was totally disabled and unfit for any type of work. Similarly, Plaintiff argues that a clean progress report and the lack of continuing treatment for basal skin carcinomas did not rule out the possibility that he could have a recurrence at some undetermined point in the future.

The law is clear that an ALJ must consider a claimant's subjective complaints of pain and other limitations. *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981). However, it is within the ALJ's discretion to determine their debilitating nature. *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987). The burden is upon the Plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the Plaintiff's subjective testimony against the objective medical evidence that has been produced. *Chaparro*, 815 F.2d at 1010 (citing *Jones*, 702 F.2d at 621 n.4). The ALJ may discredit a Plaintiff's subjective complaints of pain and attendant physical limitations if he or she carefully weighs the objective evidence and articulates his or her reasons for doing so. *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989)(citing *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988)). It must be remembered that the evaluation of a Plaintiff's subjective complaints is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. *Harrell*, 862 F.2d at 480. In the final analysis, the responsibility of weighing the evidence and determining the

credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Greigo v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

Pursuant to 20 C.F.R. §404.1529(c)(1) and SSR 96-7p, in assessing a claimant's credibility an ALJ must first determine whether the objective medical evidence shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the symptoms complained of, such as pain. SSR 96-7p, 1996 WL 374186 at *2; *Herrera v. Comm. of Soc. Sec.*, 406 Fed.Appx. 899, 905 (5th Cir. 2010). If so, the ALJ must then evaluate the intensity and persistence of the symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. *Id*. If the claimant's symptoms are not substantiated by objective medical evidence, the ALJ must consider all of the evidence of record, including any statements by the claimant concerning his symptoms, and then make a finding on the credibility of the claimant's statements relative to the symptoms and their functional effects. *Herrera*, 406 Fed.Appx. at 905. While an ALJ must consider subjective evidence relating to pain and other symptomology, it is within his or her discretion to determine their disabling nature. *Id*. (quoting *Wren*, 925 F.2d at 128). "Although an ALJ 'is bound . . . to explain his [or her] reasons for rejecting a claimant's complaints of pain,' he [or she] is not required to 'follow formalistic rules in his [or her] articulation.'" *Id*. (quoting *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994)). It is not sufficient for an ALJ to make a single conclusory statement that the individual's allegations have been considered, that the allegations are or are not credible, or to simply recite the factors that are described in the Regulations for evaluating symptoms; rather, the

14

ALJ's decision must contain specific reasons for the finding on credibility, supported by evidence of record, that are sufficiently specific to make clear the weight that the ALJ gave to the claimant's subjective complaints and the reasons therefor. SSR 96-7p, 1996 WL 374186 at *2.

A review of the ALJ's decision reveals that she properly weighed Plaintiff's hearing testimony and subjective complaints against the objective evidence of record in arriving at Plaintiff's residual functional capacity ("RFC") to work, specifically citing §404.1529 and SSR 96-7p on no less than two occasions, as well as the two-step analysis discussed above. (Tr. pp. 14-15). After summarizing Plaintiff's hearing testimony, the ALJ found that while his medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of said symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (Tr. p. 14). The ALJ then discussed the medical records reflecting the history of Plaintiff's cardiac difficulties, culminating with the successful placement of the ICD on June 21, 2011 for "secondary prevention." Restrictions at that time included no driving pending doctor's approval, no lifting of greater than ten pounds for a few weeks, and avoidance of overhead usage of the left arm, with the aim of there being a gradual return to full activity.

Approximately one week later, Dr. Rolston executed the first "To Whom It May Concern" letter noted earlier. That letter, unaccompanied as it was by any contemporaneously-recorded, medically acceptable findings, is entitled to little weight on that basis alone. *Warneke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980). This is particularly so given that a separate clinic note from that date contains no clear indication of any

15

complained-of symptoms or activity restrictions of a more permanent nature. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1989). The Court also observes that while Dr. Rolston's letter purported to embrace ". . . any sort of mental or physical work . . . ," it was more specifically addressed to Plaintiff's continued ability to satisfy the arduous demands of a FedEx deliveryperson, work that was described by Plaintiff as involving standing, walking, and lifting packages of up to one hundred sixty-five pounds for eleven hours per day, five days per week. (Tr. p. 151). By contrast, Plaintiff's past customer service job involved only sitting with no lifting. (Tr. p. 153). In any event, the ALJ gave Dr. Rolston's first "To Whom It May Concern" letter diminished weight because it was largely based on symptoms that existed at a snapshot in time and did not account for the subsequent lack of treatment which is suggestive that Plaintiff's ICD functioned properly without incident – as he testified to at the administrative hearing – and never activated to return his heart rate to a regular rhythm. The absence of treatment or any significant findings may properly be considered by an ALJ in adjudicating a claimant's disability status. *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).

Continuing with her discussion of the medical records, the ALJ next noted Plaintiff's visits to Dr. Rolston on July 21 and August 11, 2011 with the lone restriction on the latter date being a prohibition against doing yardwork during what was then the summer months. Thereafter, the ALJ noted, the record revealed no further evidence of any cardiac-related symptoms or treatment. (Tr. p. 15). Nonetheless, in March of 2012, a period of over seven months later, Dr. Rolston executed a second "To Whom It May Concern" letter in which he indicated that Plaintiff continued to be at an extraordinarily high risk for sudden

16

cardiac death and was totally disabled and unfit for any type of employment. That letter also contained the opinion that Plaintiff was ". . . unable to participate in the duties of his present job . . ." even though Plaintiff was not working at the time. Given the lack of ongoing treatment or any findings, significant or even contemporaneous, the ALJ appropriately gave this second letter the weight that it deserved. (Tr. p. 15). In addition, a physician's statement that a claimant is "disabled" or "unable to work" is accorded no special significance as that is a legal conclusion and the ultimate issue that is reserved to the Commissioner. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003)(citing 20 C.F.R. §404.1527(e)(1)); *Cooper v. Astrue*, No. 09-CV-1232, 2010 WL 3304972 at *6 (W.D. La. July 30, 2010), *adopted*, 2010 WL 3304863 (W.D. La. Aug. 19, 2010)(same in case involving plaintiff with pacemaker). Moreover, Plaintiff testified at the administrative hearing that he walked several blocks several times per day on the advice of his doctor, that he could stand for an hour at a time, that he could lift twenty-five to thirty pounds, and that he had no problems with sitting except when doing so for long periods of time which caused slight numbness in his legs. Plaintiff's admitted ability to engage in such activities is not indicative of someone who is unable to perform any work whatsoever. *Leggett*, 67 F.3d at 565 n. 12; *Anderson v. Sullivan*, 887 F.2d 630, 632 (5th Cir. 1989).

Under the rubric of his first challenge, Plaintiff also takes exception with the ALJ's finding that his basal cell carcinoma did not meet the twelve-month durational requirement set forth in the Social Security Act. In addressing this contention, the Court first observes that Plaintiff did not identify a skin disorder as a disabling condition in his application for DIB and related paperwork. *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989). Be that as it may, a review of the ALJ's decision reveals that she properly discussed

17

the medical evidence pertaining to treatment for that condition which began on July 15, 2011 and ended on December 14, 2011. (Tr. pp. 15-16). Having done so, the ALJ was justified in making the credibility determination that she did. *Giles v. Astrue*, 433 Fed.Appx. 241, 249 (5th Cir. 2011). Because the mere existence or diagnosis of a condition and its attendant symptomology does not equate with a finding of disability under the Social Security Act, *Randall v. Astrue*, 570 F.3d 651, 658-59 (5th Cir. 2009), it follows that the existence of an asymptomatic condition that may manifest itself again at some undetermined point in the future is equally non-disabling.[2/] This challenge is without merit.

Plaintiff's second challenge to the Commissioner's decision is that the ALJ failed to apply the correct legal standard in assessing his RFC. Plaintiff argues that the RFC assessment that was arrived at by the ALJ failed to account for all of the limitations resulting from all of his severe impairments which included coronary artery disease, a history of myocardial infarction, basal cell carcinomas, and AICD placement. Plaintiff suggests that a proper RFC assessment should have limited sitting to two to three hours at a time and standing to one hour at a time and that the VE's answer to the hypothetical question that contained such limitations establishes that he was unable to work.

In addressing this challenge, the Court again notes that Plaintiff did not identify a history of myocardial infarction, basal cell carcinomas, or AICD placement as disabling conditions in his application for DIB and related paperwork. *Pierre*, 884 F.2d at 802. Nevertheless, based upon the medical evidence that was presented, the ALJ found that Plaintiff suffered from severe impairments in the form of AICD implantation and basal cell

---

[2/] Giving Plaintiff the benefit of doubt, the ALJ included in her RFC assessment avoidance of work in the sun. (Tr. p. 14).

18

carcinoma of the skin. However, those impairments, whether considered in isolation or in combination, failed to satisfy the criteria of any of those set forth in the Listing of Impairments. Having so found, the Regulations mandated that the ALJ make an assessment of Plaintiff's residual functional capacity ("RFC"), a term of art that embraces a claimant's ability to work despite his physical and/or mental impairments. 20 C.F.R. §§404.1520(e), 404.1545; *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988). Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining a claimant's RFC is reserved to the Commissioner and at the hearing level, that assessment is entrusted to the ALJ. 20 C.F.R. §§404.1527(e)(2), 404.1546(c).

In light of the impairments that she found to be severe, the ALJ properly assessed Plaintiff as having the RFC for a range of sedentary work that was limited by an inability to climb ladders, ropes, or scaffolds or to work at heights, around dangerous machinery, or in the sun. While Plaintiff suggests that further limitations on sitting and standing were appropriate, he cites no record evidence which makes those added limitations appropriate. An ALJ need incorporate in a hypothetical question to a VE only the limitations supported by the evidence and recognized by the ALJ. *Masterson v. Barnhart*, 309 F.3d 267, 273-74 (5th Cir. 2002). After reviewing the medical evidence of record, an SSA medical consultant found that Plaintiff was capable of light-level work and could thus perform his past relevant work as a customer service representative. (Tr. pp. 39-47). Although the ALJ's RFC assessment was more restrictive than that which had been arrived at by the medical consultant, those findings are entitled to due consideration here. 20 C.F.R.§404.1527(e)(2)(i). At the administrative hearing, Plaintiff testified that he could stand for an hour at a time and that sitting was not problematic except when done for long

periods of time. The Regulations provide that "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Contrary to Plaintiff's present contention, the ALJ neither applied an incorrect legal standard in assessing his RFC nor did she misapply that standard to the evidence that was before her. *See Pineda v. Astrue*, 289 Fed.Appx. 710, 712 (5th Cir. 2008).

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied and that Defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 24th day of December, 2014.

MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

20